[Cite as *In re Strain*, 2010-Ohio-6716.]



# Court of Claims of Ohio
## Victims of Crime Division

The Ohio Judicial Center
65 South Front Street, Fourth Floor
Columbus, OH 43215
614.387.9860 or 1.800.824.8263
www.cco.state.oh.us

IN RE: ROMENA I. STRAIN


JAMES P. STRAIN

       Applicant


Case No. V2009-40277

Commissioners:
Randi M. Ostry
Elizabeth Luper Schuster

OPINION OF A TWO
COMMISSIONER PANEL

{1}The appeal presently before this panel involves the death of Romena Strain, the wife of the applicant James Strain. After thoughtful review of the case file and careful consideration of the testimony presented by the parties, the majority of this panel finds that the applicant has proven, by a preponderance of the evidence, that Romena Strain's death was the result of criminally injurious conduct. Accordingly, the decision of the Attorney General is reversed.


*I. Procedural History*

{2}On June 10, 2008, the applicant, James Strain, filed a compensation application as the result of injuries sustained by Romena Strain on July 13, 2006. On April 5, 2007, Ms. Strain died as the result of the injuries sustained on July 13, 2006. On December 8, 2008, the Attorney General issued a finding of fact and decision determining that the fatal injuries Romena Strain suffered on July 13, 2006, which resulted in her death, were not the result of criminally injurious conduct. On January 2, 2009, the applicant submitted a request for reconsideration. On March 9, 2009, the Attorney General rendered a Final Decision finding no reason to modify its initial

decision.  On April 6, 2009, the applicant filed a notice of appeal from the March 9, 2009 Final Decision of the Attorney General.  The appeal hearing was held by this panel of three commissioners on January 21, 2010 at 10:00 A.M.

*II. Applicant's Position*

{3}The applicant, James Strain, and his attorney Alan Lehenbauer attended the hearing, while Assistant Attorney General Tyler Brown represented the state of Ohio.

{4}The applicant related that Romena Strain was a victim of criminally injurious conduct as defined by R.C. 2743.51(C)(1).  The applicant asserts based upon circumstantial evidence, a review of the scene of the incident, and the gunshot wound sustained by Ms. Strain, the applicant has met the burden of proof necessary to establish criminally injurious conduct.  The only other explanation for her injuries would have been attempted suicide, and no evidence has been submitted to conclude that she possessed suicidal tendencies.  Finally, there was no evidence that her injuries were caused by an accident.  Accordingly, the applicant asserts the Attorney General's decision should be reversed.

*III. Attorney General's Position*

{5}Based on the investigation conducted by the Lucas County Sheriff's Office and the Bureau of Criminal Identification and Investigation (BCI), there is insufficient evidence to prove that Ms. Strain's injuries and subsequent death were the result of criminally injurious conduct.  Therefore, the Attorney General requests that its decision be affirmed.

*IV. Witness Testimony and Argument*

{6}The applicant called John Pezzino,  a private investigator, who was retained by the applicant to investigate the incident of July 13, 2006.  The applicant presented Mr. Pezzino with a copy of his report, Applicant's Exhibit 1.  Mr. Pezzino recounted that

he met with Lucas County Sheriff's deputies and investigators, along with Strain family members; that he physically inspected the scene; canvassed neighbors; reviewed police reports; and obtained an affidavit from the initial responding officer.   Mr. Pezzino summarized an affidavit of Joseph Gorney-Siminetti, the Lucas County Sheriff's deputy who initially responded to the scene, as finding Ms. Strain lying on her stomach with a hand gun near her with spent cartridges near her body.   She related to the deputy that intruders were on her property and she was defending herself.

{7}Mr. Pezzino stated the house in which Ms. Strain was shot was located off the road in a rural location near the borders of Lucas and Fulton Counties.   The residence was not visible from the road.   Mr. Pezzino related based upon the initial Lucas County Sheriff's report which characterized the incident as an assault and the subsequent BCI report which upgraded the incident to an aggravated assault, there was no question in his mind that Ms. Strain was a victim of crime.

{8}Mr. Pezzino revealed during the course of his investigation he became aware of an individual who lived in the area, Tyler Arnold, and who had a history of misdemeanor and felony arrests.   When this individual's mother was questioned by Detective Stooksbury, she stated her son was at a friend's residence on the night of the incident.   However, a review of the Lucas County Sheriff's file revealed that Tyler Arnold's mother had filed a runaway juvenile report regarding him on the night in question.

{9}After review of the coroner's report, Mr. Pezzino stated the coroner James Patrick, listed the cause of the gunshot wound as "undetermined."   However, he stated that soot and bone fragment at the site of the injury was consistent with a contact or near contact gunshot wound to the back of the neck.   No ballistic report was compiled, and no   forensic examination was performed on either the weapon found at the scene or the bullet fragments contained in Ms. Strain's neck.

{10}Mr. Pezzino testified that based upon the lack of evidence concerning any depression issues suffered by Ms. Strain and the location of the gunshot wound to the

back of the neck, combined with the fact that the investigation was classified by law enforcement as an ongoing criminal investigation he did not believe that Ms. Strain was attempting to commit suicide at the time she was injured. Also, he determined that it would be highly unlikely that the shooting was accidental, in that the soot located at the site of the gunshot wound would not be consistent with a ricocheting bullet.

{11}Finally, it was Mr. Pezzino's opinion that the police and forensic investigation was inadequate.

{12}Upon cross-examination, Mr. Pezzino revealed that he was paid $1,500.00 for his investigation and will be paid $125.00 per hour for court appearances. The Attorney General questioned the witness relative to Tyler Arnold's connection to the incident. Although 12 police reports were presented concerning criminal activities Tyler Arnold had engaged in, Mr. Pezzino was unaware of the final disposition of those cases. Mr. Pezzino asserted based on this history of bad acts Mr. Arnold may or may not have been involved in some incident at the Strain residence on the night in question. However, Mr. Pezzino believed based upon review of the search warrant signed by Judge Gary Byers and the police and BCI reports that Ms. Strain was in fear for her safety on the night in question. Whereupon, the testimony of Mr. Pezzino was concluded.

{13}The applicant called Jodi Lynn Perry, the decedent's daughter, to testify. Ms. Perry related that the first contact she had with her mother on the day of the incident was at St. Luke's Hospital. Later, when her mother was transferred to St. Vincent Hospital, it was discovered that she had a gunshot wound in the back of her neck. It was at that time that the police began questioning Ms. Perry about any enemies her mother had and gave her mother an alias, for her own protection while she remained hospitalized. Her mother was never able to relate to her what transpired at the time she was injured.

{14}Ms. Perry recounted that she returned to the scene of the shooting the next day and observed her father's recliner and a fan had been overturned. Her mother's open purse was lying on the floor of the hallway, near where her mother's body had been found. Ms. Perry found that very unusual since her mother did not walk around her home at night in her pajamas with her purse. It was unknown if any contents in her purse were missing.

{15}Ms. Perry recollected that her mother showed no signs of depression prior to her injury and stated that she did not believe her mother's injuries were self-inflicted.

{16}Upon cross-examination, Ms. Perry related that Detective Atkins of the Lucas County Sheriff's Department told her he was disgusted with the mishandling of the initial incident scene and was unhappy with the follow-up investigation.

{17}Upon questioning from the panel, Ms. Perry testified there was blood on her mother's shirt. Ms. Perry stated that nothing in the home was missing, however, there was no money in her purse and it could not be determined if any money was missing. The bullet hole was located on the inside of the door and from the angle of the indentation it appeared the door would have been partially open when it was struck. Whereupon, the testimony of Ms. Perry was concluded.

{18}Finally, the applicant, James Strain, was called to testify. Mr. Strain recounted on the day of the incident he received a call from his daughter Ms. Perry stating she was unsuccessful in contacting her mother. Mr. Strain who was in Alabama on business, was also unsuccessful. Consequently, he telephoned his mother, Lila Strain, who lives in the area, to check on his wife Romena Strain. He received a return call from his mother revealing she had found Romena on the floor with the residence in disarray. Accordingly, he immediately left the job site and drove home.

{19}Upon his return home at approximately 6:30 A.M., the next morning he was met by a deputy sheriff. The deputy proceeded to question him for approximately 5 hours. He had the impression that he was being treated as a criminal suspect. He

was not allowed to enter the premises, until he was cleared as a suspect when his alibi that he was in Alabama had been verified.

{20}He spoke to his wife while she was at St. Vincent Hospital, however, she could not recall what happened to her. Her clothing was thrown away at St. Luke's Hospital.

{21}When he initially entered his residence he was surprised by the overturned furniture and the bullet in the door. However, no DNA tests were taken and no fingerprints were recovered from the gun or anything else at the scene.

{22}The gun had been stored in the closet in their bedroom. The gun had not been used for 15 to 20 years. Mr. Strain was very surprised that the gun was out of its hidden location.

{23}The applicant was shown Applicant's Exhibit 2, a statement of Lila Strain, the applicant's mother. The statement contains a description of the premises upon her arrival, noting the front door was open approximately 18 inches.

{24}Upon questioning by the panel, Mr. Strain opined that Romena Strain would not have retrieved the gun unless she feared for her life. Although his wife had no specific recollection of the events surrounding the incident, she expressed the feeling that there may have been an intruder on the premises. Mr. Strain stated that he believed the bullet fragments were removed from his wife's neck, but no tests were performed on these fragments. Whereupon, the testimony of the applicant was concluded.

{25}The applicant moved for submission of Applicant's Exhibit 1 and 2. The Attorney General expressed no objection.

{26}The Attorney General called Detective Mark Woodruff of the Lucas County Sheriff's Department to testify via telephone. Detective Woodruff stated he became involved in the investigation of this case shortly after the department was notified that Ms. Strain had sustained an injury. Initially, it was unknown what had happened.

Although Gorney-Siminetti of his office initially responded to the scene, his only role was to secure the gun found at the scene.  Gorney-Siminetti played no other role in the investigation of this matter.   Detective Woodruff stated any statement Gorney-Siminetti provided to the private investigator does not accurately reflect the investigation conducted by the Lucas County Sheriff's Department.

{27}Detective Woodruff stated he interviewed Ms. Strain in the hospital.  He stated she recalled hearing noises outside the residence, and retrieving a firearm, but had no recollection beyond that point.

{28}Detective Woodruff related that Mr. Strain was considered a suspect  as would anyone who had access to the residence but was not at home when the incident occurred.   Mr. Strain was cleared as a suspect after his alibi had been verified.  Detective Woodruff obtained a search warrant to search the residence.   Upon entering the residence there was no evidence of forced entry, a book was lying on the floor a chair an overturned, a dog was inside the residence and fecal waste was present, but no items were missing.   Tyler Arnold became a suspect during the investigation because he was a known troublemaker in the area.   The sheriff's department investigated Tyler Arnold and was satisfied with his alibi.

{29}Because the family did not agree with the conclusions reached by the Lucas County Sheriff's Department, BCI was called in this case .   BCI took measurements of the bullet hole in the door and generally observed the scene.   BCI did not conclude this was the scene of a burglary.   Detective Woodruff concluded that the gunshot wound was self-inflicted accidentally from a ricochet.   The case is classified as inactive.   Finally, he was unaware of any disparaging remarks Lieutenant Atkinson might have made about the investigation.

{30}Upon cross-examination, Detective Woodruff stated that to obtain a search warrant he was required to swear that there was possible knowledge that a crime occurred.   He conceded that probable cause was necessary to obtain the search

warrant.   The judge issued the search warrant based upon evidence presented by Detective Woodruff and Detective Stooksbury.

{31}Detective Woodruff related that the coroner chose not to remove the bullet fragments from Ms. Strain's body so no tests could be performed.   The detective stated while he was aware that the door to the Strain's residence was open, he did not find that fact unusual.   Detective Woodruff conceded that he never discussed Ms. Strain's condition with any doctors who were involved in her rehabilitation in Michigan; that he never tested the weapon to determine it was operable, or whether it was fired by Ms. Strain; that he never fingerprinted any item at the scene; that he never read the coroner's report; and that there was no evidence that the gunshot wound was intentionally self-inflicted.   Detective Woodruff admitted that the ricochet theory was speculation.

{32}Upon questioning by the panel, Detective Woodruff testified the ricochet point in question could never be determined.   There was no physical evidence discovered at the scene to verify a ricochet point.   Whereupon, the testimony of Detective Woodruff was concluded.

{33}Finally, applicant concluded by stating after a review of all the evidence presented this panel should reach the conclusion that it has been proven, by a preponderance of the evidence, that Romena Strain was a victim of criminally injurious conduct.   Initially, the police believed a crime had been committed when they presented probable cause evidence to the judge to obtain a search warrant. Furthermore, the ricochet theory cannot be substantiated when compared to the findings of the coroner that the bullet wound was sustained at close range.   Therefore, the Attorney General's decision should be reversed.

{34}The Attorney General asserted simply because a search warrant has been obtained does not mean that a crime has been committed.   The Attorney General cited *In re Warren,* V2008-30014tc (9-5-08), for the proposition that the uncorroborated statement of the applicant does not constitute sufficient proof, by a preponderance of

the evidence, to establish criminally injurious conduct occurred.   In this case, the facts do not explain what actually happened.   Without specific fact about what actually happened, the panel should defer to the opinion of law enforcement that no crime was committed.   Consequently, no weight should be given to the private investigator's report.   Therefore, the panel should affirm the decision of the Attorney General. Whereupon, the hearing was concluded.

*V. Controlling Law and Precedent*

{35}R.C. 2743.51(C)(1) in pertinent part states:

"(C) 'Criminally injurious conduct' means one of the following:

"(1) For the purposes of any person described in division (A)(1) of this section, any conduct that occurs or is attempted in this state; poses a substantial threat of personal injury or death; and is punishable by fine, imprisonment, or death, or would be so punishable but for the fact that the person engaging in the conduct lacked capacity to commit the crime under the laws of this state."

{36} "In order to establish that an applicant is a victim of criminally injurious conduct, the applicant has the burden to prove by a preponderance of the evidence that 1) the criminal conduct occurred or was attempted; 2) the criminal conduct posed a substantial   risk of personal injury or death, and 3) the criminal conduct was punishable by fine, imprisonment or death."   *In re Gradison,* V78-3385jud (1-13-82).   *In re Warren*, V2008-30014tc (9-5-08).

{37}Black's Law Dictionary Sixth Edition (1990) defines preponderance of the evidence as: "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not."

{38}Black's Law Dictionary Sixth Edition (1990) defines burden of proof as: "the necessity or duty of affirmatively proving a fact or facts in dispute on an issue raised

between the parties in a cause.  The obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court."

{39}Circumstantial evidence may be considered in determining whether an applicant qualifies as a victim of criminally injurious conduct.  *In re Williams*, V99-65291tc (10-25-00).

*VI. Panel's Determination*

{40}From a review of the claim file and with careful consideration of the testimony of the witnesses and the arguments by counsel at the hearing, a majority of the panel finds that the applicant has met his burden of proof and Romena Strain was a victim of criminally injurious conduct.  We reach our conclusion based upon the evidence at the crime scene, the police investigation, and the coroner's report.  The unrefuted affidavit evidence of Lila Strain, the applicant's mother reveals "the door [was] open about 18 inches.  As I entered I found the recliner chair tipped forward and an end table tipped over on its side.  There was a large plant and some other smaller items knocked on the floor also."  The police report filed by Officer Gorney-Siminetti revealed there was a .22 caliber revolver with five spent shells and one unspent shell found and secured by EMS personnel, that was located near Ms. Strain's body.  Also, the officer observed a bloody book lying beside her body.  After a search warrant was executed for the Strain residence, officers found Romena's purse lying on the floor near the bathroom.  The applicant's daughter Jodi Lynn Perry testified the purse was open. BCI investigator Ed Biederstedt, in his written report stated:  "A small circular hole was located on the interior side of the metal-clad front door.  A small circular convex puncture mark visible on the exterior side of the door, although no breakage of the metal-clad door is noted.  The small circular hole on the interior side measured 4 ½ inches from the non-hinged side of the door and 49 11/16 inches from the bottom of the door.  The small circular convex puncture mark on the exterior side measured 5 1/4

inches from the non-hinged side of the door and 49 ½ inches from the bottom of the door.

{41}The Lucas County Coroner James Patrick stated: "It is my opinion that Romena Strain died of intracerebral hemorrhage due to intractable hypertension due to cervical spinal cord injury with incomplete quadriplegia due to gunshot wound of the neck." He also found: "skin-scar with soot and bone fragments consistent with contact or near contact remote gunshot wound." The gunshot wound was located on the posterior neck with spinal cord injury at C5-7.

{42}A careful review of all this evidence indicates that it is more likely than not that Romena Strain was the victim of criminally injurious conduct. For the purposes of this program it is not necessary for us to identify a suspect, offender, or motive involved. The applicant need only satisfy the burden that criminal conduct occurred, that the conduct posed a substantial threat of personal injury, and that the crime is punishable by fine, imprisonment, or the death penalty. We believe the applicant sustained his burden. We find based upon the totality of the evidence and the credibility of the applicant and his daughter that it has been established a crime scene was present and Romena Strain was the victim of a crime.

{43}We find the alternative scenario offered by the Attorney General contrary to the evidence. The Attorney General urges us to find that Ms. Strain's injuries were received by a self-inflicted accidental gunshot wound. According to this version of the events Ms. Strain discharged a handgun in her home for some undetermined reason, the bullet struck the door and ricocheted off some unknown object and struck her in the back of the neck. However, a supplemental crime report filed by Detective Stooksbury on August 2006 in pertinent part states:

{44} "On 7-22-06 this officer spoke with Jeff Hibbard and Barry Christy Life Squad 9 Hibbard and Christy were the first on the scene at the home of Romena Strain when the 911 call came in. They state the following. They were meet [sic] at the rode [sic] by the mother in law. When they went in the

house the front door was unlocked.   When they walked in the home they saw a head in the hallway they had to walk in some before they saw the head."

{45}It appears from this statement that Ms. Strain was not in a direct line from the door; and coupled with BCI's inability to find a ricochet point after close inspection of the home, we are not satisfied as to the physical possibility of such a ricochet. Furthermore, the coroner's report clearly states the gunshot wound was consistent with "contact or near contact remote gunshot wound."

{46}Although Romena Strain could never offer an explicit description of what happened on the night in question, this fact alone should not disprove that she was a victim of criminally injurious conduct.   We believe sufficient evidence exists in the claim file and by testimony presented to find that the applicant has established criminally injurious conduct as defined by R.C. 2743.51(C)(1).   Therefore, the Attorney General's March 9, 2009 decision is reversed.

_____
RANDI M. OSTRY
Commissioner

_____
ELIZABETH LUPER SCHUSTER
Commissioner

**GREGORY BARWELL, COMMISSIONER, DISSENTING OPINION**

{47}I respectfully dissent.   I have had the opportunity to review all the evidence as have my colleagues,   yet I reach a different conclusion.   I do not believe it is proper to construct a scenario which benefits the applicant in this case.   The burden of proof rests solely with the applicant.   I do not believe the applicant sustained his burden. While the majority interprets the evidence to find criminally injurious conduct, I believe

the same evidence could be interpreted in a variety of ways to reach a contrary conclusion. For example, I find it plausible that the door of the residence was closed prior to Ms. Strain's discovery by her mother-in-law. Detective Woodruff testified a dog was in the residence and feces was present. If the door of the residence was open, the dog would have went outside to defecate and then returned to the residence. However, if the dog was enclosed in the residence this would not have been an option. It is well settled in the law that the party with the burden of proof must produce evidence which furnishes a reasonable basis for sustaining the claim. If the evidence furnishes a basis for only a guess, among different possibilities, as to any essential issue in the case, the burden has not been sustained as to such issue. *Landon v. Lee Motors, Inc.* (1954), 161 Ohio St. 82.

{48}While I sympathize with the applicant for the tragic loss of his wife, I cannot find that he has sustained his burden of proof. Perhaps we shall never know how the gunshot wound occurred, and it will remain a mystery. But speculation is never adequate to prove criminally injurious conduct and without concrete evidence that points to criminal conduct of some kind, I believe the Attorney General's decision should be affirmed.

_____
GREGORY P. BARWELL
Presiding Commissioner



# Court of Claims of Ohio
## Victims of Crime Division
The Ohio Judicial Center
65 South Front Street, Fourth Floor
Columbus, OH 43215
614.387.9860 or 1.800.824.8263

IN RE: ROMENA I. STRAIN

JAMES P. STRAIN

      Applicant

Case No. V2009-40277

Commissioners:
Randi M. Ostry
Elizabeth Luper Schuster

ORDER OF A TWO
COMMISSIONER PANEL

IT IS THEREFORE ORDERED THAT

{49}1)   The Applicant's Exhibits 1 and 2 are admitted into evidence;

{50}2)   The March 9, 2009 decision of the Attorney General is REVERSED and judgment is rendered in favor of the applicant;

{51}3)   This claim is remanded to the Attorney General for total economic loss calculations and decision;

{52}4)   This order is entered without prejudice to the applicant's right to file a supplemental compensation application, within five years of this order, pursuant to R.C. 2743.68;

{53}5)   Costs are assumed by the court of claims victims of crime fund.

_____
RANDI M. OSTRY
Commissioner


_____
ELIZABETH LUPER SCHUSTER
Commissioner

ID #I:\VICTIMS\2009\40277\4-22-10 panel decision.wpd\DRB-tad

A copy of the foregoing was personally served upon the Attorney General and sent by regular mail to Lucas County Prosecuting Attorney and to:

Filed 9-23-10
Jr. Vol. 2276, Pgs. 173-174
Sent to S.C. Reporter 10-11-11